## Smith *et al. versus* Bouvier *et al.*

1. When a judge has explicitly announced in the general charge a doctrine applicable to the case ; he need not repeat the same thing in answer to points. He may refer to the charge for answer.

2. The judge commits error, when he says nothing in his charge as to the subject of the points and does not answer the points, if they are material.

3. Not answering points is not *per se* error ; unless the points were material and ought to have been affirmed, it is not error.

5. Bonâ fide time contracts for sale of stocks or other personal property are legitimate.

5. When stocks are bought and sold, although upon speculation, if they are to be delivered, it is not a gambling transaction.

6. Kames, not owning stock, employed a broker to sell stock for him at a named price, to be delivered at a particular day, the stock was sold and at the time of delivery, prices having risen, the broker borrowed stocks to meet the engagement. He afterwards, under instructions from Kames, bought at a higher rate to replace the stock borrowed. *Held* to be a legitimate transaction and that Kames was liable to the broker for the difference.

7. Brua's Appeal, 5 P. F. Smith 294, recognised and distinguished.

January 5th 1872. Before Thompson, C. J., Agnew and Sharswood, JJ. Williams, J.

Error to the District Court of *Philadelphia :* No. 198, to July Term 1870.

This was an action of assumpsit brought May 12th 1869, by John V. Bouvier and M. C. Bouvier, trading as J. V. Bouvier & Co., against William F. Smith and Joshua Kames, trading as Smith & Kames, for money laid out and expended by the plaintiffs, brokers in New York, on the purchase and sale of stocks for the defendants.

[Smith *v.* Bouvier.]

On the trial a question was raised as to the partnership of the defendants in the transactions; and also whether the plaintiffs had obeyed the defendants' instructions; both were found against the defendants by the jury.

The principal question was, whether the transactions were gambling operations.

J. V. Bouvier, one of the plaintiffs, testified:—"About 15th April 1869, I met Kames at Stock Exchange, New York; it was suggested by one of us that he should do business with me, and I was to do it for $\frac{1}{16}$ per cent. When we sold in advance of the purchase, I allowed Mr. Kames one-half of the interest I received. On 16th April 1869, he concluded to sell 1000 shares of N. Y. Central, short; he gave me a verbal order; I sold as much as 200 shares first, and then 800 on same day, together 1000 shares, at $165. On April 17th 1869, it became necessary to deliver this stock to purchasers, and we had to go to our neighbors to borrow it. Mr. Kames, by the arrangement, was to place in my hands, as security, a margin of 10 per cent. on par value; Mr. Kames came to the office to hand my brother this margin; on my returning thither I was surprised to see that Kames had only given my brother $5000, instead of $10,000; then I arranged with Mr. Kames to draw for the balance of the margin; he then said he was doing business for the firm of Smith & Kames, and instructed me to draw on them at Downingtown, Pa., up to 21st April. Instead of stock going down it advanced; about 3 per cent. of the $5000 margin became exhausted by the rise in stock. We then drew on S. & K. for $5000, April 21st 1869; we placed the draft on S. & K. in Bank of Commonwealth for collection. On 24th April Kames returned to New York; he said the operation had gone against him, and he wished to sell a second thousand, which would advance his average $2\frac{1}{2}$ per cent. I sold the second thousand on the same day to R. W. King, at $169\frac{3}{4}$. We then returned to office—had not heard from draft—we were then to draw on Mr. K. for the additional 10 per cent. margin on this new transaction; this was on Saturday; on Monday we heard that the first draft for $5000 had not been honored; * * * On 27th April we bought in 2000 shares of stock, at an average of $174\frac{5}{8}$; we had previously telegraphed them that we would do so. While Mr. Kames was in New York he told me to take back the stock and cover it at a fixed loss; this was put in writing; this is it.

"'Buy for my account, 2000 shares New York Central @ 166, or in event of that stock going against me, take the 2000 shares in @ 175. SMITH & KAMES.'
April 24th '69.

"'Take in' means to buy—we did not buy at 166 because the stock did not fall, but rise; we took in the 2000 shares at an

[Smith v. Bouvier.]

average of 174⅝; that is better than the order—after we had taken in the shares at an average of 174⅝, we at once notified Smith & Kames that we had done so, both by letter and by telegram; we covered the stock at the market price. The stock rapidly advanced to a point at which the loss would have been about $70,000, if we had not bought in as soon as we did. The stock went to 218; on May 24th it sold for 194⅛. The net amount of loss is $9631.36."

On cross-examination, witness said:—"We were to charge him one-half commission and allow him one-half interest. We sold 1000 New York Central for them. I was to borrow the stock. Nothing was said about our delivering the stock to him. We did not expect to purchase stock for them. We were, by the agreement, to borrow it from our neighbors, and to deliver it. The margin was to be ten per cent. on par value of stock. We did not expect them to deliver the stock to us. We were to be made whole by the payment of the difference. It was a speculation. I reported to Smith & Kames the price at which I sold the stock. This was a 'short sale.' A short sale is not a sale with an intention not to deliver the stock. * * * I purchased the stock in the Long Room of New York Stock Exchange. The sessions of the Board are overhead. The Long Room is where the Stock Board meets. I gave notice to Smith & Kames, by telegram and letter, of buying the stock. I think I sent them notice before night. I did not state when and where I would buy. * * * I made these purchases all in the same day."

By deposition, thirty-six bankers and brokers testified "to the actual sale of 2000 shares of stock, New York Central Railroad Company, on the days and times stated in plaintiffs' testimony, and at the then market rates; that the same were actually delivered and paid for; and, also, that 2000 other shares of said stocks were purchased by said witnesses, for account of plaintiffs, at the times and rates stated by the plaintiffs in their testimony, and that the then market rates were then paid by the plaintiffs, in full for said stocks, and the same actually delivered by the witnesses to the plaintiffs."

The plaintiffs gave evidence of sales of 2000 shares of New York Central Railroad stock to persons who were named, with amounts sold to each, 1000 shares at $165 per share, and 1000 at $169.75.

M. C. Bouvier testified: "I suppose in short sales the rule is that the interest accrues to the broker; that is the custom. The shares we purchased to cover the stock were delivered on the 28th of April to the persons from whom we borrowed the shares."

The evidence was very voluminous, principally as to the fact of the partnership of the defendants, and as to the plaintiffs carrying out their instructions in the stock transactions.

[Smith *v.* Bouvier.]

The defendants' points which were refused were:—

2. "If the arrangement was that the plaintiffs should sell the stock without its being delivered to the plaintiffs by the defendants for delivery to the purchaser, but upon the hazard of the stock falling below the price at which it was sold, in which event it was again to be purchased at the reduced price for the defendants' account and profit, but, if it should advance in price, then the defendants to be liable for such advance, such transaction was one of chance and hazard, and contrary to law, and cannot be maintained and recognised in the courts of this Commonwealth, and the verdict should be for the defendants."

3. "Nor did the fact that the plaintiffs went through the circuity of borrowing the stock for delivery to the purchasers, in order to keep the transaction as between the plaintiffs and defendants open until the stock should advance to 175, or be ordered by the defendants to be taken in, legalize the operation, as the purchase of the stock was to cover the short sales in order to ascertain the result of the venture pursuant to the arrangement between plaintiffs and defendants."

Besides these, a number of points, not necessary to state in detail, were submitted by each party, on all the questions raised in the case.

The court (Thayer, J.) charged:—

* * * "In regard to the lawfulness of the transaction upon which the plaintiffs' claim is founded, I instruct you, that if the transaction was a speculation founded on a real sale and purchase of stocks by the plaintiffs for the defendants, which were actually sold and bought and delivered, then it is not a gambling transaction, and is not an unlawful contract, or one which the law refuses to recognise as a lawful contract.

"The distinction is between a real transaction, where stock is actually bought and purchased and delivered, and a transaction in which that is not contemplated at all, and where the parties agree, from the beginning, that the stock is not to be delivered, but that they are to settle their mutual wagers upon the price of stock by paying the difference between the sales at the different times. That is a distinction which is very easily appreciated; the law will not allow the time of the courts of justice to be taken up by settling people's bets, or any other frivolous engagements in which they may choose to enter. But there is no objection to the transaction, if it be a real transaction, and a real delivery of the stocks is contemplated and effected, or that it was a speculation. It is the business of all people who engage in trade to speculate; all trade is based upon speculation, and no contracts are obnoxious to legal objection merely because they are speculations. * * *

"In the first place, I submit to you, that if the transaction was a speculation, founded upon a real sale and purchase of stocks by

[Smith *v.* Bouvier.]

the plaintiffs for the defendants, which were actually sold and bought and delivered, then it is not a gambling transaction, and is not an unlawful contract.

"And, secondly, I instruct you, if speculation in stock, by the purchase and sale thereof, is not a part of the regular business of bankers, then Mr. Smith is not bound by this transaction, and is not responsible for it unless he either authorized it or ratified it, or unless the firm, with his consent, engage in stock transactions, or unless by his previous conduct he had allowed Mr. Kames to use the firm name for such purposes, in such a way and to such an extent as to lead persons to believe that that was a part of the business of the firm.

"I instruct you, in the third place, that if the contract of the plaintiffs with the defendants was an absolute one, that they were not to buy any stock until it had reached 175, and if they had no discretion in the premises whatever, then of course they had no right to buy it in at less price. I put it to you whether that is a reasonable construction of the contract which was entered into; was it not rather that the plaintiffs were not to let the stock go beyond 175 before buying it in, and is not that a reasonable interpretation of the written order, in view of what was plainly the interest of the defendants, and of what occurred at the time?" * * *

Concluding his charge, the judge said :—

"1. If the transaction was a speculation founded on a real sale and purchase of stocks by the plaintiffs for the defendants, which were actually sold and bought and delivered, then it is not a gambling transaction, and is not an unlawful contract, or one which the law will refuse to recognise as a lawful contract.

"2. If speculating in stocks, by the purchase and sale thereof, is not a part of the regular business of bankers, then Mr. Smith is not bound by this transaction, and is not responsible for it, unless he either authorized it or ratified it, or unless, by his previous conduct, he had allowed Mr. Kames to use the firm name for such purposes, in such a way and to such an extent, as to lead persons to believe that that was a part of the business of the firm.

"3. If the contract of the plaintiffs with the defendants was an absolute one, that they were not to buy in the stock until it reached 175, and if they had no discretion in the premises whatever, then, of course, they had no right to buy it in at a less price, and the plaintiffs' 3d point would be well taken; but is that a reasonable supposition?

"Is that the contract which was entered into? Was it not rather that the plaintiffs (as Mr. M. Bouvier says) were not to let the stock go beyond 175 before buying it in, and is not that a reasonable interpretation of the written order, in view of what

[Smith *v.* Bouvier.]

was plainly the interest of the defendants and of what occurred at the time?"

The verdict was for the plaintiffs for $10,348.17.

The defendants removed the record to the Supreme Court by writ of error.

The errors assigned were—the answers to the points and the charge of the court.

Some of the assignments were that certain of the points of the defendants were not categorically answered.

*A. Briggs, J. A. Simpson* and *F. C. Brewster,* Attorney-General, for plaintiffs in error, cited Brua's Appeal, 5 P. F. Smith 298.

*P. Archer, Jr.,* and *W. L. Hirst,* for defendants in error.

The opinion of the court was delivered, January 16th 1872, by

THOMPSON, C. J.—Having attentively listened to an earnest and able argument, to convince us of error committed by the learned judge who tried the case below, and a no less able argument to the contrary, by the learned counsel for the defendants in error, we have addressed ourselves assiduously to the task of determining, by principles of law, which party is right in the contest, and the following discloses the result.

The general charge has been considered in order to discover from it the force of special objections to it, as well as to determine whether its instructions were in themselves sufficient for the points propounded. The scrutiny has resulted in satisfying us of its unobjectionable character in both aspects. Certainly a judge who has explicitly announced a given doctrine or view, supposed to be applicable to a case trying, in the general charge, need not repeat the same thing in answer to points. He may refer to his charge for the answer. Error occurs where the judge has said nothing in his charge on the subject-matter of the points, and then neglects or refuses to answer specifically points material to the case. The failure to answer points is not *per se* error, and, unless the party propounding them can show that they were material and ought to have been answered as prayed, there is no error.

The charge before us, referred to for answers to points submitted by the defendants when examined, will be found to be very sufficient answers to the points raised. There was, therefore, no error in not answering them specifically. The condensation by the learned judge of the aspects of the case into three propositions, was a very satisfactory presentation of the matters to be considered by the jury, and were all sustained by the clearest principles. They will appear in the report of the case.

[Smith *v.* Bouvier.]

The main contention in the case, however, was not this, but whether or not the transaction, an ordinary purchase and sale of stocks through the plaintiffs as brokers, was or was not a gambling transaction, and one which should for that reason deprive them from recovering for money advanced and commissions earned. This, the learned judge instructed the jury, would be the character of a transaction where, from the beginning, it was agreed and understood, that the stock dealt for was not intended to be delivered, but that the parties were to settle their mutual wagers on the prices of the stocks, by paying the difference between sales at different times. He further explained, saying, "I submit to you, that if the transaction was a speculation founded upon a real sale and purchase of stocks by the plaintiffs for the defendants, actually sold, bought and delivered, then it was not a gambling transaction and not an unlawful contract."

This was right, but it did not go far enough, according to the theory of the plaintiffs in error. They insisted that the jury should have been instructed that all purchases of stocks, with a view to re-sell and make profit on their rise, or contracts to furnish stocks on time, should be declared gambling transactions and illegal, not only between buyer and seller, but as to the brokers or agents through whom the sales and purchases had been made. This would make a great inroad into what has, for an indefinite period been regarded as a legitimate business, and would either destroy it altogether, or if continued, put the brokers at the mercy of those for whom they transact such business. Let it be understood that a broker has no power to recover either for advances or commissions, however honestly he may have dealt, and there will be found enough persons whose easy consciences would throw their losses upon the shoulders of those who advanced the money and earned commissions in their service. It would be a very palpable wrong to the brokers who are licensed to do such business, if such were held to be the law. To this extent Brua's Appeal, 5 P. F. Smith 294, never was intended to go. That case came before the court on the report of auditors, expressly finding that the notes in question were given for stakes or bets on the rise and fall of certain stocks—that neither party was to receive or deliver any stocks. The auditors said: "Kauffman in effect betted that in twenty-five days Harlem stock would sell at less than $60 per share; but viewed in the aspect of legal principles and precedents, the contract was one which the parties were free to make, and the obligations created by it, and the subsequent notes are in law untainted by any fraud and deceit, or want of consideration," and therefore they held that the "notes" should come in for a *pro rata* share of the assets of the decedent's estate.

This we regarded as a "most lame and impotent conclusion." Having nothing to do but to administer the law against betting

[Smith *v.* Bouvier.]

and gambling, we held the consideration of the notes illegal, and the contract incapable of enforcement. This result cannot be doubted. But we held in the same case, that stock-brokerage was not necessarily gambling. We said, " the bonâ fide purchase of stocks no doubt can be conducted lawfully, and is generally so conducted without in the least trenching on the gambler's province. * * * Bonâ fide time contracts about stocks and other personal property, seem from custom to be necessary in our country, and although such transactions may be greatly affected by the rise and fall of the market, yet they are not for this reason obnoxious to the objections made to the transactions we are now considering; for in such case the losing party has something for his money, but the losing gambler nothing."

The doctrine contended for here would place all stock contracts on the same footing, if making profits may be deduced as the motive of the parties buying and selling. When stocks are bought and sold, to be actually delivered, it is a very different case from that of Brua's Appeal, *supra*, where the transaction was found to have been simply a bet or wager. In the one case the transaction is within the scope of a business everywhere recognised as legitimate; in the other, it is a gambling transaction, which courts will never exert their power to enforce, if not entirely executed by the parties.

Whether the transactions embraced in this case were bonâ fide, or were merely in a form to cover gambling transactions, after a full explanation of what constituted the true difference in law between them, was left to the jury to say upon the evidence, to which class they belonged. The jury found them to have been bonâ fide actual sales, and purchases of stocks to be delivered. As there was no error in these instructions, this result settled the defence against the defendants below and plaintiffs in error. The instructions on all the other questions raised here, were proper and such as the case required. We must therefore affirm the judgment.

Judgment affirmed.